281 So.2d 543 (1973)
In re ESTATE OF Laura E. VERDIER, Deceased.
Jean M. VERDIER, Appellant,
v.
John L. VERDIER et al., Appellees.
Nos. 72-202, 72-328.
District Court of Appeal of Florida, Second District.
July 20, 1973.
Rehearing Denied September 13, 1973.
Guy L. Kennedy, Jr., and Richard T. Bennison, of MacKenzie, Castagna, Bennison & Gardner, Clearwater, for appellant.
Robert D. Jones, of Skelton, Willis & Jones, St. Petersburg, for appellees.
LILES, Judge.
The methods used in probating this estate afford laymen cause to give validity to HOW TO AVOID PROBATE by Norman Dacey (1965).
Laura Verdier died testate on January 26, 1970, in St. Petersburg, Florida, with the expressed hope that the bulk of her estate would be expeditiously distributed to her partially blind, minor niece, Jean Verdier. Such was not to be.
Her will was obviously a simple one designating her brother, John Verdier, executor and leaving most of her estate, some $160,000, to her minor niece, Jean M. Verdier. Jean lived with her father and mother in Sydney, Ohio. Her uncles, John, George, and Willis, and her Aunt Lola, all *544 lived within a radius of approximately eight miles and had so lived there for many, many years. They were all involved in a business known as the Verdier Brothers, Inc. Laura Verdier had lived in Washington, D.C., prior to moving to St. Petersburg, Florida.
February 13, 1970, John Verdier was appointed executor and commenced the probation of his sister's will. One of the first things the brothers evidently noted was that their niece was to receive approximately $130,000 by survivorship in tenancies held jointly with her Aunt Laura. John then proceeded to have prepared an agreement whereby he, along with his brothers Willis and George, would divide the $160,000 from the estate equally with Jean, each receiving approximately $40,000. His reason for this is unknown to this court and is cited for the purpose of showing that John immediately demonstrated to all of the parties, except, of course, his niece Jean, his personal interest in the estate. Jean's father, Doyle, refused to enter into the agreement and this precipitated the next action.
George and Willis came to St. Petersburg and consulted an attorney on the probable success of a will contest and/or the filing of a claim. The attorney advised them that the better course would be to file claims and he furnished them claim forms. They returned to Ohio and filed their individual claims. Willis' claim was for personal services from 1946 through 1968 and was listed as: driving expenses $11,397; labor and services $12,226; interest $18,533, making a total of $42,156.36. We will forego commenting on the hourly wage of a chauffeur, the hourly rate for labor and services, but we are compelled because of the wording of F.S. § 733.18(3), F.S.A., to question the allowance of interest in the amount of $18,533. We do note, however, that the claim amounted to only $2,156.36 above what he would have obtained had John's proposed agreement been consummated.
George filed a claim for personal services from 1947-1969 for business assistance and trip charges, whatever those are, in the amount of $25,660. He had no expense for labor and services but he had interest claims of $13,976, making the total claim $39,636. George was even more consistent with the amount he would have received had John's proposed agreement been consummated. We entertain the same doubt as to the validity of George's interest claim.
Then Virginia Verdier, Willis' wife, filed a claim for room, nursing services, and personal expenses in the approximate amount of $2,000; and the other sister, Lola, filed a claim and withdrew it.
John, the executor, whose duty it was to properly administer the estate, chose not to contest these claims because, in his words he thought it would be in "the best interests of the family relationship." He entirely overlooked the fact that Jean, his niece, was a member of the family. Jean's father, Doyle, obtained the services of his personal attorney, Mr. Rieck, who had been handling the transfer of assets held jointly by Jean and her Aunt Laura. They could have, simply by complying with the local rule, obtained copies of all instruments filed in the estate. This was not done. Even though Doyle, Jean's father, was shortly thereafter either expelled from the family corporation or voluntarily left, depending upon whose testimony you want to believe, he evidently thought all was well.
The executor of the estate, John, for some unknown reason failed to advise Jean's father or anyone else that these claims had been filed for a period of approximately eight months when he finally got around to mentioning it to Doyle after the time for filing objections had expired. Doyle contacted his attorney, Mr. Rieck, and instead of Mr. Rieck filing an instrument in the court, he wrote to Judge Miller and in effect asked him what to do. Judge Miller is a very busy probate judge *545 and it was approximately two months before he got around to writing Mr. Rieck. Instead of telling Mr. Rieck to seek Florida counsel in this first letter, Judge Miller advised that this matter might be settled, attempting to be helpful. Apparently Mr. Rieck attempted to settle this matter but to no avail. Mr. Rieck then wrote Judge Miller another letter inquiring of him who he might obtain in Florida. Judge Miller then advised him that he could not recommend counsel and that he should consult MARTINDALE-HUBBELL, which he slowly but patiently did.
He finally obtained the services of Guy L. Kennedy, Esq. Mr. Kennedy then filed a petition objecting to the claims, requesting removal of executor, requesting an administrator ad litem, requesting reopening of the claim objection period, and requesting surcharge of the executor, John Verdier, forfeiture of his fees and charging of his bond. The matter was subsequently heard before Judge Miller and the court, after hearing testimony relating to whether good cause existed to extend the time for filing objections, denied the petition to reopen the objection period. In his order, Judge Miller indicated that the fact that Jean was a minor until after the time for filing objections to claims had expired was good cause; but that after she reached her majority, seven months expired without any objections being filed and that this barred her from asserting her minority as good cause.
On the basis of the record at that hearing, we hardly find fault with Judge Miller's order. Another hearing took place on February 17, 1972; and after hearing voluminous testimony the court, among other things, removed the executor but denied the motion for rehearing on the good cause issue and the other motions filed by Mr. Kennedy. It was at this hearing that this matter took on the nature of an adversary proceeding. Up until this time it does not appear in the record that anybody was enthusiastic in representing the minor, Jean. This case truly became adverse on the appellate level.
We are called upon to determine whether or not the court erred in failing to find good cause to extend the time for filing objections. We deal first with this question.
It should have become apparent to Mr. Doyle Verdier, the father of Jean, and to Mr. Rieck, his privately retained counsel in Ohio, that John, the executor, had a personal interest in the estate when he attempted to enter into an agreement which had the effect of rewriting his sister's will as regards her niece. The fact that an executor allowed these claims to be paid without contest would in and of itself be good cause because of the very nature of the claims.
Another factor to be considered in the proper forum is what effect the statute of limitations has on claims for labor and services and whether a claim in an estate may act to defeat the statute of limitations? Were the services of such a continuing nature that the limitations period began running only after the last rendered services? Is it reasonable that those rendering services would wait twenty years to assert their claim if valid?
The apparent disagreement between Doyle and his brothers in the family corporation should have been a harbinger of what was to come. Then the fact that John failed to advise anyone that his brothers had filed the claims is evidence of lack of good faith and is another element which goes to show good cause for extending the time for filing objections. The effect of Judge Miller's order is to penalize Jean, who after obtaining her majority, attempted through Mr. Rieck and her father to do something. While Mr. Rieck did not act as I or any other Florida attorney probably would have, we cannot conclude that we must now punish Jean for the circuitous action of her father and Mr. Rieck. *546 Once "good cause" has been found to exist, more should be required to erase the "good cause" than what we have here. Although much of what was done in her interest during the eight months after Jean became twenty-one amounted to wheel spinning, action was being taken. Under all of the testimony adduced at both hearings, the order denying the extension of time for filing objections is reversed.
Appellant next urges that the trial judge should have under these facts appointed a guardian ad litem and we agree. It became apparent early in the probation of this estate that the executor had an adverse interest to Jean, the minor; and when he failed to advise her of the filing of the brothers' claims and particularly when he failed to contest these claims, he demonstrated in no uncertain terms his adverse interest. Somebody should, by necessity, have been appointed to protect the testamentary recipient of Laura's bounty as manifested by her will. Under both Florida rules and statute, the trial judge is authorized, if not directed, to do so. See, PGR 5.230 and F.S. § 732.54, 55, F.S.A. (1967).
We reverse the order directing payment of claims for the reason that they will only hearafter be properly tried and payment at this time would be premature.
In conclusion, we cannot help but comment on the pitfalls of the disposing of one's assets accumulated by them during their lifetime. It was not the prerogative of John, George, Willis, Lola, Doyle or Jean to direct Laura in the disposition of these assets and to do so by subterfuge after death is not to be condoned by our judicial system. Nothing in the record would support the time that has transpired nor the expenses that have been incurred in probating this estate. We have no idea what Jean will finally inherit.
We reverse with directions to proceed without delay with the further probation of this estate, the filing of notice of objection to claims, and the immediate appointment of an administrator ad litem. If any surcharge is warranted that suit may be prosecuted, and any funds recovered distributed to Jean M. Verdier, the initial as well as the eventual object of her aunt's will.
Reversed and remanded for action consistent with this opinion.
McNULTY, J., concurs.
MANN, C.J., concurs in the result.